First case that we will hear for argument this morning is Kane County v. United States. It is docket 22-4087, and Ms. Hartnett, we'd be pleased to hear your argument when you're ready.  Good morning, Your Honors, and may it please the court. I'm Kathleen Hartnett on behalf of the Southern Utah Wilderness Alliance and other proposed intervenors, collectively referred to as SUWA. I'm planning to try to reserve five minutes of my time for rebuttal. Can you speak into the microphone? Yes, sir. Okay. Is that better? A little bit. You have two panelists with hearing aids. I'll try not to yell, but there we go. Thank you. Your Honors, this case and its predecessors have a long history, but the present appeal is straightforward. The district court failed to apply this court's controlling intervention precedent, specifically this court's decision in Kane 1-2019, because it disagrees with that precedent. The district court's decision should be reversed. The present litigation in Kane 2 is exactly— Let me ask you a question here. This does not involve a question of land management, this case, this particular case. Correct, Your Honor. So what is your interest, since you're land management people? Your Honor, as the court has recognized from San Juan County on a through line through Kane 21-19, our interest is an environmental interest. It is implicated by this dispute. It's an important dispute. Here, the state and the county want to open the roads at issue to vehicular traffic. These are roads that include stream bottoms and dirt paths. Well, what can you add to the case that the U.S. is not already arguing or going to add? A lot. And I think these are things that are happening on a daily basis in the Kane 1 litigation. So Kane 1 is on remand from this court in the 2014 decision. It's a dispute about scope. SUEA is actively participating in Kane 1 now as an intervener of right. It is putting on experts. It's putting on witnesses. It's putting on arguments. And these are all things that are additive but not disruptive to the proceedings. And so I think we respectfully submit that just as Kane 1 is proceeding on remand with SUEA as an intervener, precisely as this court intended, the same result should be what is happening in Kane 2. Unfortunately, however, the district court simply disagrees with this court's precedent. And there has been a long line of discussion and debate about these. Counsel, I'm sorry to interrupt you. When you mention the disagreement with precedent, I'd like you to tell me what your understanding is of what precisely is binding on this court from Kane 1 2019. Yes, Your Honor. So I believe the things that are binding on this court from Kane 1 2019 is that we, SUEA, collectively as the interveners have standing, either piggyback or direct, regardless of which is needed, that we have an interest in this dispute under the intervention rule, Rule 24, and that we are not adequately represented by the United States with respect to scope. Those are the issues that were before the court in Kane 1 2019. Scope was before the court there because scope was the only issue on remand. The open question, to the extent there is one, is whether adequacy of representation in this case exists for title, because title was not clearly presented in the 2019 decision before this court. But I would just, to the extent that the district court was seeking to reach a result here, and I would direct you, and you've no doubt looked at it, the district court's opinion did not seek to grapple with that issue and try to figure out, okay, how can I resolve the issue of Kane 1 2019 being about scope, and here we have both scope and title. But the district court even actually conceded in its order under review that those two questions are presented through the same evidence at trial. The district court's opinion just makes clear it disagrees with the adequacy of representation holding from Kane 1 2019. And that's no small matter. We came to this court in 2019 after the district court refused to apply Kane 1 2019 in Kane 2, something that all the parties expected to happen. They went before the district court, they said we're here, we're ready for Kane 2 to proceed now with SUA at the table as a full party. The district court held a hearing, took it back, and then issued a 2019 decision disagreeing with that, essentially almost revoking the permissive intervention that SUA had been granted. SUA then re-raised the motion after the mandate issued from this court, because the district court's argument was that it didn't have to abide by Kane 1 2019 until the mandate issued. The mandate eventually issued. We then came back to say, okay, the mandate has issued, that obstacle to our intervention that you identified is gone, and the district court sat on the motion for over two years. And then when the order under review doesn't provide any principled basis for distinguishing Kane 1 2019. What about the 2010 case? What's Kane 2010's ruling on title? Does that have any bearing on this appeal? It does, Your Honor, only in that I think we see it as providing a through line, not a disagreement about the precedent, but a through line. In 2010, at that point in the litigation, title was only at issue. And that was in part as the court, the opinion acknowledges, based on some concessions that SUA made in that case, that that was a case about title and scope was not yet presented. And these were all arguments made in 2019 as to why SUA was not bound by that 2010 ruling, because things had evolved in terms of both the adequacy of representation and the understanding of the court and how scope actually works in practice. It is not the simple binary determination that some may have hoped back at the beginning of this case in San Juan County. And I would say, Your Honors, this is something where SUA is not trying to— Counsel, can you slow down a little bit? I can't listen as fast as you're talking. Apologies, Your Honor. Thank you. I just would direct you to the San Juan County case where this all began, which you obviously are familiar with. There, the court did specifically contemplate that future developments could allow for an evolution in SUA's participation. And so K1-2010 determined that that was not necessary at the time. K1-2019, basically hearing all of the same arguments that are before the court today, decided that SUA was entitled to participate. And there's just nothing in the district court record to indicate why that would be a problem or difficulty. It just doesn't— had some language about whatever presidential administration was in power may favor one side as opposed to another, just as far as philosophy. And as the district court points out here, the administration has changed since 2019. And is that enough of a basis for the district court to say things are not different? No, Your Honor. And I would say that's—that is—that's fair to say that that is the one actual, I guess, change to circumstance at the time of the district court's order. In this case, the Trump administration was not in power any longer. The Biden administration had come into power. But I would respectfully submit that the rationale in 2019 was not that simply the Trump administration was in power and therefore SUA gets to come in. It was more that the change in presidential administration and the concurrent changes in potential litigation strategy by the Department of Justice that happened to, at that point, coincide with that change of administration made clear that what was thought to be true at the outset, that the United States and SUA have identical interests, is actually not the case. That the United States, as it conceded here before Your Honors in the 2019 argument, has 12,000 roads to worry about. And it has the prerogative of a landowner to be concerned with, which is a lot of different interests. Here, we have an environmental concern. That is our focus. We have intervened in cases where that concern is present. We're not just massively intervening in any case at all. We don't want to be the federal government. We want to be SUA. So to your point, I don't think that the court's rationale from 2019 really hinged on what administration was in power, as much as the fact that that had shown that in this discrete issue, 2477 cases involving these land rights in Kane County, that the United States is not a reliable advocate for us. Okay. A second potential distinguishing factor that the district court could, and I think did rely on, is time has passed. And any skepticism or doubts about whether the United States was forcibly and fervently defending title and scope, there's a better understanding now. And the district court says, through the change of administration over the passage of this time, I observe, and I'm telling you, Court of Appeals, that the United States is fighting for scope just as strenuously as it can. Doesn't that mean something to us? Shouldn't we give that some credence and credit? Your Honor, it's certainly worth, obviously, considering that argument. First of all, to the extent that the notion would be that sort of SUA gets to be in during a potentially hostile administration, but not in when it's not a hostile administration, itself would be an unworkable principle, and certainly I don't think one that anyone is arguing for. On that specific point, though, SUA has been additive, and I would point the court to Kane 1 on remand from this court, where SUA is an intervener of right, and it's experts, for example, is a good example. The experts that were not able to present in Kane 2 have gone drawn from a deeper well of historical resources. They have more refined aerial imaging, and we also take a different view than the United States on some matters that wouldn't disrupt the proceedings but are important. For example, when you're looking to scope, do we simply look at the maintenance before 1976? That's our view, that we should look at maintenance before 1976. The United States has not made that argument. They would look to maintenance after 1976. So these are a couple of examples. I don't want to overly get in the weeds, but these are not disruptive differences. But even on that, the United States could think that your help is not helping. It could want to achieve the same result and think by adding these extra experts and extra testimony, that's actually undermining its ability to get the relief it seeks from the district court. Is that a fair comment? I mean, I guess you should ask them. I think we've been able to deal with them well in our litigation dealings. I think Kane 2 has almost been an alternative reality from Kane 1, where we're able to proceed as normal. There's nothing odd happening there. It's a regular litigation. But it's also, at the end of the day, not the role of the parties to veto the intervener. The question is, and I think this is just a faithful application of your court's precedent from San Juan County through Kane 1 2010 through the showings that SUA has made to date, that it is both a productive litigant and one that brings something additional to the table, a wilderness focus that the United States does not have. It seems to me that there's a tension in the argument that you're making, that on the one hand, Kane 2019 established conclusively the scope issue. And we are now to apply that precedent. And then on the other hand, we need to engage in a new analysis of the adequacy of representation as the scope. So do you see, is there a tension or am I missing something? No, I don't think you're missing something. I think I should be even more clear. The adequacy of representation is really the part of this that the court in San Juan County had said could be something that we would look at later on. Not the standing, although the standing law has changed somewhat. So that's been modified, etc. I think what we would say is nothing material has changed since we were allowed in in 2019. And so for the adequacy of representation inquiry to be redone over, something material has to change. And the things that changed were in 2019, unlike back in San Juan County, unlike in 2010, scope had come to the fore. And it was clear that it was more complicated than just this binary determination that had been the premise of the earlier cases. And also that the United States had shown that as time passes, it is not necessarily a reliable advocate. Nothing has really changed materially. There may have been an administration change, but there's not been that showing that you would need to come back to this court again to re-argue 2019. And I think that the district courts, you know, the district court itself acknowledged at the hearing where it essentially defied this court rather than simply just denying intervention in K-2 and letting us come back here and make these arguments. It just said I might have to redo this. That's on the transcript from the September hearing in 2019. And we would respectfully submit that's not the way this should work. We are not trying to be annoying. We don't take lightly having a district judge not be happy with us. On the other hand, we're simply trying to have the seat at the table that we believe 2119 requires us to have at least a scope and that makes equal sense with respect to title because the two issues do go hand in hand in the way that they are litigated in the court. Why did you think at the outset that you moved to participate as a right or in the alternative as a permissive intervener? Why did you think permissive intervention would satisfy your ability to represent your interest in the case? We didn't, Your Honor. Our position has always been that that's a typical posture to be in, which is that we wouldn't want to waive any argument. So we wanted to be at the table as fully as possible. We made an intervention of right argument and then we were granted in the beginning of K-2 permissive intervention. That's not immediately appealable. So we ended up going through that permissive intervention scope. And I think it's important to note that the earlier part of the permissive intervention in this case did allow us to do some things. We did have to make a request before we could file any motion and we had other strict limits on our participation, but we were able to do something. Then in 2019, after K-1 2019 came out, rather than extend that permissive intervention or actually let us in as a right, as we thought this court's ruling required, the district court essentially revoked our permissive intervention and at that point has allowed us to only speak through the United States. Well, it didn't revoke it. It just put limits on it, right? I would not say that the first permissive intervention was a revocation. I'll be fair about that. The second one was essentially one. I mean, the 2019 order from September 2019 is pretty clear that it's taking away all but our most basic. All we were able to do was to file one pretrial brief and otherwise everything we have to do is speak through the United States. And we respectfully submit, based on this 2019 ruling from this court, the United States does not adequately represent our interest. And so the notion that we are going to be in K-2 only with the United States, with which we obviously attempt to work with collaboratively, but we do at times have different interests and different questions and different perspectives, they're not going to say everything we ask them to. What is actually happening right now in the district court? So if you were to prevail in this case and be able to fully litigate scope as your client intends, isn't the record closed? I mean, what would happen below? Thank you, Your Honor. In K-2, currently, there's some supplemental briefing that's been happening. You're right, the trial ended in 2020. So we've been waiting for the court to schedule closing arguments. We would obviously seek to participate in those arguments. We would also seek to supplement the record with evidence that we have that has not been placed into the record. I think we would want to assess at the time what we want to do. We would want to become part of K-2 in the least disruptive way possible that accomplishes our interest. And K-1, just for Your Honor's reference as well, that trial has also concluded. We, as a full intervener in that case, have submitted post-trial briefs like the other parties. And I just think K-1 provides such an obvious example and a reference point for the court that these sky is falling kind of notion of what the state, the county, and even the district court have contemplated for us being in K-2 is simply just not reality. Reality is that we have an interest. The court's precedent has recognized that. What explains the dissonance in your view? It's probably complicated. It could be a whole other argument. But I do think that the permissive intervention scheme that has been happening since the beginning of K-2 has just been unworkable. Because every time, if you have to ask the court every time you want to do something, at some point the court gets annoyed with you continuing to ask. I also just think the long history of this case and that people have strongly held views about where we should be and where we shouldn't be has clearly informed some of the decision making. And all we want to do is have our voice heard in an efficient and effective way. Can I ask you one question about something in your brief, page 33? You say, quote, it is not possible to allow sewers intervention as the scope, but not the title. And when I read that, I think, well, if you're not going to be allowed to intervene on title, you're just telling us you don't want to intervene in scope. It's impossible for you to do that. Well, I think what we mean is anything is possible as a practical matter. And this is where I would direct your honors to the court. The district court's own order acknowledges that the evidence comes in in the same way. So say there's a lay witness that's coming up to speak about both the existence of the road and then various features of the road. It would be very cumbersome to have sewer be able to only object to questions that were arguably as to one or the other. And so I do think they are legally distinct inquiries, which is, of course, the point that San Juan County made. But in terms of just a practical reality, I think being in for one and not the other would be more cumbersome than just letting us be in full. OK, so maybe that was overstated in the brief. I guess we haven't seen a way, let's put it this way, no one has argued for that type of bifurcation and we haven't seen a practical problem. But you're right, nothing is impossible. One last point, and we understand this is an important case. We're going to try to stick to the clock, but we're going to get through the case. The last point that I want to ask you about, that Judge Waddup's helped me with, is the discussion of right-of-way versus roadway. And what his point is, is that if you have a 10-foot roadway, you're going to need some extra space for the right-of-way to maintain the road or whatever else. And that he is not saying that, as part of scope, that you can expand the roadway. And when I hear that, I think maybe it is better for you to be participating when that day comes. Because you would have a seat at the table then for sure, right? If they wanted to pave, they wanted to widen the road, so forth. Your Honor, I just would say that the reasoning in K-1 2019 was prescient and correct on this point, which is that this is an important, vital step toward that ultimate goal. The goal is not to have some technical notion in a book somewhere of whether the United States or the state or the county owns the road. The whole entire point of this is about, is it going to be widened? Is it going to be paved? Or is it going to be wildlands? That's why everyone's fighting so much. That's why the district court is resisting us. So I just think that this is something where the reason why this is important is because it's the important gateway step to that next debate. The next debate in a different forum. That's correct, Your Honor. But K-1 2019 is law of the circuit and made clear that we, and not on the adequacy point, but on the point of what our interest is and what this is all about. And this is all about what this road is going to be used for. Additional questions at this time? All right. Reserve the rest of your time. Thank you, Your Honor. Good morning, Your Honors. Good morning, Counsel. Thank you for your arguments. From our perspective, the task for the panel in this case is fairly straightforward, because in our view, the outcome on the panel level is largely controlled by two prior opinions in this case, a 2010 opinion in the King County case. King County, one case that found that the United States adequately represents the conservation groups on the question of title, and a 2019 opinion in which, although we disagree with it and reserve our arguments, in our view, it's hard to distinguish from this case on the question of whether the United States adequately represents the conservation groups on the question of the scope of the right of way. Wasn't the 2010 case limited to at the stage of litigation? Why isn't title? I think that language is in there, but the reasoning of the case still applies. The question of title is a single legal objective that we share with SUA. We believe we own the road. SUA believes we own the road. I guess my question is sort of the same thing I asked your friend on the other side about to what extent do we have to undertake a new analysis versus applying prior panel precedent? So, is it the position of the United States that we don't need to revisit the title inquiry at all because 2010, Kane says? So, in our view, there isn't any basis in the record here to distinguish the reasoning of the 2010 opinion. I think if SUA had presented concrete evidence that we were not representing them on title because we were colluding with the state and county or had actual adverse conflicts of interest with them that were preventing us from arguing the kind of concrete interest that this court anticipated in the tri-state transmission and generation case, if they made that kind of showing, I think you'd have to look at that showing and see if you thought it met the standard, but I don't think they've made that kind of argument here. And I think we are still, as the district court notes, vigorously defending our title in this property. And I think given that singular objective in this court's analysis of where there is a shared single objective, even if our motivations differ, that is adequate representation. I think that means on the title question, in our view, there isn't a way to distinguish the 2010 case now. On the 2019 case, although we disagree with it, we think, again, it made findings on whether they had an interest in the property, relating to the property, and whether they were adequately represented on the scope of the runway. And while we disagree with that conclusion and are reserving our arguments on it, we don't see ways to distinguish it here. So that I'm sure I understand the lay of the land. Your position, the United States, is that obviously you don't like 2019, and en banc has been an ongoing issue. But as far as the district court on the intervention motion in this case, you think that Kane 1 series of cases required the district court to allow the intervention? Is that correct? On the issue of scope, it is hard for us to see a basis to distinguish it, assuming you take the 2019 opinion and its reasoning as given. Obviously, we think there's problems with that. As you noted, I think part of the reasoning in that opinion rested on Sue's argument that the actual widening of the road was an issue in that remand. And that, I think, is not an accurate description of the issues on remand, the future improvements on the road. But isn't there a connection? If the scope of the road right-of-way is wide, 66 feet, say, on a 10-foot dirt road, that's going to have an effect later on as far as what's possible with a paved roadway, isn't it? So the scope of the right-of-way and the width of the actual road service are different questions. They're different questions, but they kind of travel hand-in-hand. Right, but the way the district court should determine the scope of the width of the right-of-way as opposed to the road service, they're both based on the historic uses pre-1976 of the alleged right-of-way. And in that circumstance, the district court is making a determination about how wide, under kind of Utah easement principles, the right-of-way should be to account for a 10-foot dirt road or whatever the actual argument about the alleged road is. But it's not making a determination that they can expand the 10-foot dirt road to a 20-foot two-lane. They can't take a one-lane dirt road and make it a two-lane dirt road just because they have enough room and the width of the right-of-way. That would be the type of improvement that this court said would require a separate consultation with the federal land management agency. Even safety issues? If it's a 10-foot one-way, very seldom three automobiles heading to the homestead and to the grocery store over pre-1976, are you saying that the roadway has to stay 10 feet? So under Utah law, this would be driven some by state law on easements. They can make changes based on pre-1976 use that are reasonable and necessary for safety. So they could ask to make an improvement based on their rights under those laws, but it would still be an improvement that would require a consultation with the federal land management agency. The federal land manager might approve it because there are safety concerns, but it would be a separate question than the width of the actual right-of-way. We do think that here arguing to intervene on both title and scope isn't supported by the record because we believe, as the district court knows, that we are vigorously arguing title here and that the panel, the reasoning in the 2019 panel opinion was that the district court must determine title and scope in separate steps. And based on that, we think that the intervention on scope and not on title is a workable approach. And that approach, do you think that's a doctrinal construct or is that something that the Quiet Title Act compels? I think that's a doctrinal construct. But in our view, they are, in our view, obviously, there are questions about how sound the distinction between title and scope is because when you're talking about the easement, the nature of the title will include the terms of the easement, which will include the scope of the right-of-way. But we think they are separate legal questions that SUA could participate in discovery and in trial if there's a trial on questions about scope and be limited on questions about title or making legal arguments in briefs about scope and not about title. We think that is a workable way to approach it here that would be consistent with this court's precedent. Obviously, in our bigger picture view, we think the issue of whether or not they have an interest relating to the property is foreclosed by the 2019 panel opinion, but we don't believe they have a qualifying interest for purposes of Rule 24a because, in our view, when you're talking about a property dispute, they really need to have some kind of interest relating to the property ownership question, which they don't have here. And so in our view, really, they should be participating as an amicus or permissive intervener here. You'll save that for the en bloc. Yeah. And just one thing I wanted to clarify from my colleague's argument, title and scope were at issue in San Juan County. When the court decided that case, the case went back on remand and the district court decided both title and scope. Title and scope were both at issue after the 2010 decision on intervention. It went back to the district court. The district court decided both title and scope. The scope issues were appealed to this court in 2014 and only largely upheld. Three of the scope decisions by the district court were remanded on our appeal back to the district court for further consideration about the width of the right of way, and it was on that limited question about scope that the 2019 panel opinion was addressing intervention on that portion of the remand, but scope was always that issue in both cases. The cases weren't just dealing with title alone and then turning to scope later. Scope was always part of the considerations in those cases. Well, scope wasn't part of the consideration in 2010, was it? The case involved scope. The issue, SUA did not argue that scope gave them a distinct reason to participate in the case for intervention purposes in 2010, and so the panel decided they had waived any arguments based on the differences between title and scope. So it didn't reach it. The 2010 panel did not reach it, but the trial court was adjudicating scope at that point in time. And the other thing I think we'd want to highlight is that we have been vigorously defending this title on both this our ownership of this property both on title and scope I think as the district court recognizes, and we don't think the record shows that we have been engaged in activities that would undermine our undermine the view that we are adequately representing those interests in the trial. So, SUA makes arguments about issues like settlement or what legal arguments are being made, but ultimately those rest largely on FC Dixit about their views on why we are making arguments. For instance, in their brief they say we didn't make a statute of limitation argument that they thought we should have made and suggest it was done because of some kind of policy consideration. That is not my understanding of the record. I think if you look at their citations for his turtles all the way down they're setting in the reply they say to their opening brief and the footnote in their opening brief they cite to the record but the second record is to their emotion below there isn't any actual evidence, showing that policy considerations affected our decision making on that legal issue. And my understanding from the trial team as it was not made based on an assessment of the legal merits of the argument not based on other outside policy considerations. I noticed that I'm under 10 minutes that there are no further questions. I'll yield to my colleague from the well thank you. May it please the court, your honor, Sean Welch on behalf of King County, Utah, and also the state of Utah with me at counsel's bench is Kathy Davis, she is the public land section director for the Attorney General's office, and she would answer any questions that may go to her but we do not plan for oral argument by the state other than that. Through me, on behalf of the state and county. Your Honor, I want to go pick up right where some things left off that seem to have some serious questions from the court and had to do with the 66 foot right of way, and the scope issues. So I have the sad distinction of having argued the intervention decision in San Juan County before. Judge waters in about 2003 or 2004 that went to a 2004 divided panel opinion, which did allow Sue it to intervene into the San Juan County case, which then of course was reversed on bonk in San Juan County as we refer to that. Something Judge Jenkins mentioned in his decision and then was is quoted in the San Juan County case again and again is title to an RS 2477 right of way involves the length and breadth of a public highway right of way. Breadth is scope length is just does title exist scope and title have always been litigated as the same thing in public highway rights of way cases, there is truly kind of a two step analysis and Judge Phillips I understand from your prior opinions you've listed those out, but it's all the same evidence goes in at one time. There's maps, there's aerial imagery, there are witnesses who testify about the use of the road and what they observed as far as the footprint of the road, a broader disturbed width, and there's something else off to the side sometimes. But if the court says there was a 10 foot roadway, correct, 2477 or 77 right of way, the question of scope is still up in the air, isn't it? The court isn't bound to anything having made that finding. No, the scope involves that width of the right of way, that is beyond the disturbed width, that is Sierra Club v. Hodel, that is... I'm talking the beaten path. Correct. If the beaten path is 10 feet, you're saying that that includes the scope? Yes, that is part of the scope. The scope is entirely the width and the uses of the road. That is what scope is under Utah law. Well, I thought that scope included the need for maintenance and that sort of a... No, and so that's... Can I get there, Your Honor, really quick because I do want to tie into this 66 foot right of way issue that has been bandied about. The basis for that right of way are expert documents, the AASHTO standards, American Association of Highway Traffic Organizations. They set default standards for types of roads for how they should be constructed. Well, ours 2477 roads were not constructed by the government. They just kind of were created initially and then often maintained, and then there's some construction that goes onto those roads. But a 66 foot right of way happens to have been statutory law for a long time in Utah. It was adopted by the county as a standard right of way for all of its right of ways, and it is entirely divorced from how wide the beaten path, the footprint of the road is in the middle. Now, the counties after Judge Wattups in the 2000, in the Bald Knoll trial, those decisions issued in March of 2013 and then this court in 2014 upheld narrower rights of ways for some very major roads, and then reversed and remanded on Norswag, Swallow Park, and on the Scudamore Road. Norswag and Swallow Park were 24 foot rights of way. That was the scope determination made by Judge Wattups in that case, and Scudamore had a 66 foot right of way, and that was set aside, and that's what went back on remand. And now, here's two parts. In 2010, SUA moved to intervene, and this court denied that motion to intervene. In 2014, SUA moved to intervene again on appeal to challenge the district court's finding, which had to do with both title and scope. Those two appeals were settled. Then in 2019, what changed, Your Honor, Judge Phillips, tying directly to your question about Judge Wattups helping you understand the difference between the beaten path and the right of way, which is the scope, includes the uses, the beaten path, and how much has been used to maintain it, what is reasonable and necessary to keep that road safe for the public. So the scope is more than the trodden path. It is. And that's something that if the district court says the trodden path, as in 2014 Judge Kelly's opinion, the one road 24 to 28 foot travel surface, 66 foot right of way. That 66 feet was up in the air. That wasn't foreordained. No, that came because of the standards that were introduced in the evidence from the engineering books. And it's something that could be argued to the district court. 66 is too much. No, it's not enough. But that comes off of the same evidence that establishes the width of the disturbed path, which this is where I wanted to get, Your Honor, before I follow up on that. The disturbed path has to stay the same unless there's further federal action to allow the roads to be widened. And that was the distinguishing factor that Your Honor wrote about in the 2019 intervention decision. As you found under false facts, the King County intended to widen those two roads, the 24 foot right of way on the Swallow Park Road. There's still a 10 or 12 foot beaten path roadway for those roads. The right of way is there that Judge Waddox is going to be setting is to allow two vehicles to get past each other if they come against each other head to head. Here, I'm sure the court could see that a 10 foot right of way doesn't allow two vehicles to get around each other. Exactly. That's it. But the beaten path can still be a single lane road. And the county doesn't change the nature of those roads, cannot improve or upgrade the roads without further federal action. And on this point, and then I'll quit asking questions. Footnote 9 of Judge Waddox's order says, moreover, widening the travel surface is also not the intent of plaintiffs in King County, too. Is that a true statement? Yes, it is. You don't intend to widen the roads beyond the beaten path? In this appeal, there are two roads across the county that need to be improved right away. There are future road work to be done. We are quite entitled to what is needed as reasonable and necessary for the road right now. And then, after that title is settled, we get to go and consult with the BLM on any improvements. And what those improvements are on the Hole in the Rock Road is a resurfacing because the road is becoming a riverbed. On flash floods, it's not a streambed. But the water runoff is running down the road. And then the BLM doubled. The BLM increased the number of permits for people to travel to a location called The Wave. And there is a crossing that needs culverts. Those are the two things. But first, King County has to acquire a title to its rights of way. Then it will consult with the BLM on those improvements so that the BLM can conduct its land management activities. And as Your Honor, Judge Phillips recently wrote in SUA v. DOI on the road trail improvements, SUA had the opportunity to weigh in with its opinions at that point. That's the proper point for SUA to come in. Very briefly, Your Honor, nobody has gone back to touch on the issue of the standard of review. We just state once again, and you mentioned this earlier, Judge Waddups has had years and years to observe the conduct of SUA and the facts, the defense of the United States, the facts being induced, and the conduct before he denied the fifth motion to intervene in that case. That should be reviewed for abuse of discretion as a motion to reconsider. And on that point, the question that I ask the United States, which is I understand that you don't like 2019, but why is Judge Waddups not bound to apply that and allow intervention in this case? In other words, why is this one distinguishable as Judge Waddups says that it is? The facts. The facts. San Juan County involved an injunction obtained after a finding of environmental harm that SUA supported to keep the gate closed on the Salt Creek Road. When San Juan County moved to quiet title, it had two causes of action. Quiet title, declaratory relief, remove those gates, and allow motor vehicles back up the Salt Creek Road. That was the interest in the environment that SUA keeps quoting without citing down to exactly what was at issue. In 2019, this court found that there was harm because King County wanted to increase travel on the roads, which is not true, and wanted to double the width of the roads. That's not true. In Judge Waddups' decision, he pointed out that those were not accurate. Those facts were not the same in his decision, which is why he distinguished the 2019 decision. But if the decisions are going to be binding, the 2010 King County decision should bind, and 2019 would have been wrong. Respectfully, Your Honor. And you understand, I've been through a lot of these appeals. So we do believe on repeated—Your Honor, I see I'm over my time. You can continue. On the repeated motions to intervene, which there were several in King County 1, five in King County 2, the courts understand the lay of the land as it goes forward and can make those findings better than the appellate court on whether there is a changed circumstance or not, and that should be reviewed under an abuse of discretion. What is your best case for that proposition, that this is properly construed as a reconsideration? We cited the New Mexico case on the motions to reconsider. But those cases don't sort of grapple with the difference between consecutive intervention motions and reconsideration, do they? They are not intervention— There was one that was multiple intervention motions that were filed 50 years apart from major adjudication that just didn't seem to have a square factual basis or legal basis to really cite as the best case. We are arguing that under the successive motions to intervene, leaving aside the initial motion to intervene, which under the New Mexico case is reviewed for de novo, but successive motions to intervene to see if there are changed circumstances isn't necessarily a fact-finding endeavor. And so we've argued the motion to reconsider case law. Thank you, Your Honor. Okay, thank you. I want to be fair on the time. That was a couple of minutes over, so you can go for 3.23. Thank you, Your Honor, and I'll try to keep it short. I guess I'll just start with the standard of review. Since we were there, we believe the correct standard of review is de novo as the court—the rationale from K-1 2019 applies. I don't want to go through all of the minutiae of why we really don't have five motions for—five intervention motions at issue here. I think there was some double-counting the last time around. It's happening here, too. We filed one at the beginning of the case, but on two dockets. That counts as one. We filed—we asked for leave to file another one when circumstances changed. That was denied. We filed another one once the court issued K-1 2019. That didn't end well, and then we filed the final one to actually get before the court today. If anything, that just shows that we're trying to be diligent with our rights and that the district court was not, in our view, fairly adjudicating those motions. I would also just go back to the point about what this is all about at the end of the day. We are right now in a bellwether situation and came to with certain roads up for debate. Those include roads that are currently closed that the county and the state want to open. We're talking about roads that are currently unpaved that the state wants to pave. So this is—I don't believe that the K-1 2019 decision rests on any kind of fundamental misconceptions. I believe that at the end of the issue, at the end of the day, a wider road is a road that's less likely to be environmentally friendly and more likely to be paved, and that is settled in this court's case law. Additionally, scope is not simply about width. It also concerns the uses that the road is put to. That's a huge part of what the debate here is, is that what was the state of the road in 1976? The starting point for scope will be the premise for what the state and county seek to do with that road once they get the scope resolved. I would also just note one other thing. From K-1 2019, there's been some debate about the showing that we would need to make to overcome on the title part of the inquiry. K-1 2019 did, on the question of scope, see our interest is not identical and therefore applied the lighter minimum burden on us to overcome adequacy. But it also alternatively held that we had overcome any presumption of adequacy that occurs when the interests are aligned. So even assuming title is still seen as something where the interests are identical, we have overcome that presumption by the showing in K-1 2019. And I would respectfully submit that for the district court to then cite, to not rule on our motion for three years and then cite the change in presidential administration as a reason why we don't have a right to be before the court does strike us as a little bit perverse. It seems that if that motion had been acted on in a timely fashion, as all parties expected the court to do back in 2019, but he ultimately did not do, we would not have even had this argument about another change in administration. Finally, I would just say at the end of the day, this is a case about relitigating San Juan County. We appreciate that there are strong feelings on some of those topics. It is about relitigating K-1 2019. And with respect, the district court was not in a position to disregard those decisions. The en banc court had spoken previously. The Supreme Court denied cert the last time around. And we believe the proper course of the administration of justice here is to allow us in the case. And then for those appeals to be taken in the normal course, not to exclude us from the case for years while the cases languish and are not actually being resolved. With that, we would request that the court enter an order allowing us to intervene. Thank you. Thank you. Thank you, counsel, for your helpful arguments in the briefing as well. The case is submitted and counsel are excused.